UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

WOODNOTCH FARMS, INC.,          )
                                )
          Plaintiff,            )
                                )
          v.                    )     Case No. 2:20-cv-180
                                )
AGRI-MARK, INC.,                )
                                )
          Defendant.            )

**OPINION AND ORDER**

Plaintiff Woodnotch Farms, Inc. ("Woodnotch") operates a large dairy farm in Shoreham, Vermont.  Prior to purchasing a second farm and thus increasing its milk production, Woodnotch requested and received assurances from its exclusive buyer, Defendant Agri-Mark, Inc., that Agri-Mark would purchase the additional milk without a volume limitation.  Shortly after Woodnotch purchased the second farm, Agri-Mark allegedly changed its milk-purchasing policy such that it would pay one price for a producer's "allowed production base" amount, and a substantially lower price for milk produced in excess of that amount.  Woodnotch now claims that as a result of the policy change it is unable to afford the debt on its purchase.  Accordingly, Woodnotch brings this damages action against Agri-Mark alleging, among other things, fraud, negligent misrepresentation and breach of contract.

Agri-Mark has filed a motion to dismiss the Complaint, arguing that even if Woodnotch's factual allegations are accepted as true, Agri-Mark never imposed a volume limitation and never guaranteed prices.  Woodnotch submits that it was nonetheless misled, and opposes the motion.  For the reasons set forth below, the motion to dismiss is **denied**.

## Factual Background

Woodnotch operates a large dairy farming operation in Shoreham, Vermont.  Woodnotch is a member of Agri-Mark, a dairy cooperative formed and owned by farmers.  Under the terms of a "Member Marketing Agreement," Woodnotch has contracted to sell its milk exclusively to Agri-Mark.

In or about April 2019, Woodnotch began negotiations to purchase Parent Hilltop Farm.  Like Woodnotch, Parent Hilltop Farm was an Agri-Mark member and was bound by contract to sell its milk exclusively to Agri-Mark.  In June 2019, Woodnotch signed a purchase and sale agreement ("PSA") with Parent Hilltop Farm and delivered a $50,000 deposit.  The PSA contained a contingency allowing Woodnotch to terminate the sale and have its deposit refunded if it was unable to secure an adequate market for the milk produced at the Parent Hilltop Farm location.

Prior to closing on the purchase, Woodnotch and its lender, Yankee Farm Credit, ACA, asked Agri-Mark to confirm that it

2

would purchase the milk produced at Parent Hilltop Farm.  The
Complaint specifically alleges that Woodnotch and Yankee Farm
Credit "made inquiries of [Agri-Mark] to confirm that Woodnotch"
would be permitted to sell and Agri-Mark "would accept and
purchase such quantities of milk from the Parent Hilltop Farm
location as would make Woodnotch's purchase of that additional
farm facility financially feasible."  ECF No. 7 at 2, ¶ 7.  The
Complaint further alleges that Woodnotch and its lender sought
such assurances "in light of rumors . . . that [Agri-Mark] had
been considering policy changes of an undetermined nature which
might in the future affect Woodnotch's anticipated production."
*Id.*, ¶ 8.

       Agri-Mark responded to the inquiries from Woodnotch and its
lender in two separate communications.  First, in a letter dated
July 12, 2019, Agri-Mark wrote that "on May 30, 2019, the Agri-
Mark board of directors voted to allow you to move production to
this location under your current Agri-Mark Member Marketing
Agreement (attached).  I call your attention to Item #2 in the
legal agreement between Agri-Mark and Woodnotch."  *Id.*, ¶ 9.
Item #2 in the Member Marketing Agreement read: "**Sale of Milk**.
Member agrees to sell to Cooperative and Cooperative agrees to
buy from Member all milk of Member from the farm location or
locations described herein during the term of this Agreement

except for such milk as is retained for consumption on the premises where produced." *Id.* at 2-3, ¶ 10.

After receiving the July 12, 2019 letter from Agri-Mark, Woodnotch and Yankee Farm Credit asked for further assurance that Agri-Mark would purchase, as alleged in the Complaint, "a sufficient volume of milk from Parent Hilltop Farm to make Woodnotch's purchase financially feasible." *Id.* at 3, ¶ 12.  In a letter dated August 1, 2019, Agri-Mark wrote that "on May 30, 2019, the Agri-Mark board of directors voted to allow you to move production to this location under your current Agri-Mark Member Marketing Agreement (attached) with no specific volume restrictions noted." *Id.*, ¶ 13.

Based on the correspondence from Agri-Mark, Woodnotch moved ahead with its purchase, began buying additional cows, and made renovations to the Parent Hilltop Farm facility.  In doing so, Woodnotch reportedly took on significant indebtedness to Yankee Farm Credit.  The closing on the purchase took place on August 29, 2019.

On or about October 1, 2019, Agri-Mark announced a change in its milk purchasing policy.  The change allegedly established a "supply management program" setting an "allowed production base" for each of its producers.  Milk produced in excess of that allowed production base would receive a dramatically reduced price.

Woodnotch claims that when it purchased Parent Hilltop Farm, it expected to produce and sell a volume of milk significantly greater than the newly-imposed allowed production base.  Because of Agri-Mark's new price structure, Woodnotch has allegedly lost substantial expected income and is unable to service its indebtedness, resulting in massive financial losses.

The Complaint sets forth several causes of action.  Count One alleges fraud, claiming that when Agri-Mark sent letters to Woodnotch in July and August 2019, Agri-Mark "was aware that it would imminently be announcing and implementing the policy changes which set a limit on the quantity of milk which Defendant would purchase from Woodnotch at the previously-prevailing market rates."  *Id.* at 4, ¶ 20.  Agri-Mark allegedly had a duty to disclose its knowledge of those changes, failed to do so, and Woodnotch reasonably relied to its detriment. Woodnotch claims that Agri-Mark's communications were intentionally misleading, and that its failure to disclose material facts constituted either actual or constructive fraud.

Count Two asserts a claim for promissory estoppel.  The claim alleges that certain representations by Agri-Mark constituted promises, inducing Woodnotch to move forward with its purchase.  Woodnotch allegedly relied on those promises to its detriment.  Count Three asserts a claim of negligent misrepresentation, again based on allegedly-misleading

communications from Agri-Mark and Woodnotch's resulting reliance.

Count Four claims breach of contract.  Woodnotch asserts that the letters it received in the summer of 2019 constituted enforceable modifications to the Member Marketing Agreement, obligating Agri-Mark to purchase milk from Woodnotch without volume limitations.  Woodnotch further contends that the allowed production base policy effectively imposed a volume limitation in breach of that agreement.  The same reasoning forms the basis for Count Five, which alleges breach of the implied covenant of good faith and fair dealing.

Count Six of the Complaint brings a claim of quantum meruit, alleging that Woodnotch is entitled to compensation from Agri-Mark for the reasonable value of the milk produced, including the milk supplied from Parent Hilltop Farm above the allowed production base.  Count Seven claims a right to attorney's fees under the Member Marketing Agreement.

Agri-Mark now moves to dismiss all claims pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).  Agri-Mark argues that Woodnotch is mistakenly treating volume and price as the same thing, and that price was never guaranteed.  Woodnotch opposes the motion, contending that the allowed production base policy was essentially an impermissible volume restriction, and

that Agri-Mark either misunderstands or is misconstruing its claims.

**Discussion**

## I.   Motion to Dismiss Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Although all allegations contained in a complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

## II.  Choice of Law

Woodnotch has raised choice of law as a threshold issue. Jurisdiction in this case is based on diversity of citizenship. A federal court sitting in diversity uses the law of the forum state to determine which state's substantive law applies.  *See Thea v. Kleinhandler*, 807 F.3d 492, 497 (2d Cir. 2015) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). However, where there is no conflict of substantive law among the jurisdictions, a court should avoid the choice of law question

and apply the law of the forum state.  *Havill v. Woodstock Soapstone Co.*, 172 Vt. 625, 783 A.2d 423, 427 (2001) (citing cases).

Here, Woodnotch argues for application of Vermont law to each of its claims.  In support, Woodnotch notes that it agreed to the Member Marketing Agreement in Vermont, performed under the contract in Vermont, is incorporated in Vermont, and suffered its alleged injury in Vermont.  Agri-Mark, a Delaware corporation headquartered in Massachusetts, submits that for the majority of Woodnotch's claims there is no conflict between Vermont law and Massachusetts law.  Agri-Mark also notes that while the elements for a quantum meruit claim may differ, the result is the same.  Absent any meaningful conflicts between the substantive law of the two jurisdictions, the Court will apply Vermont law.

## III. Fraud

Agri-Mark moves to dismiss Woodnotch's fraud claim as a matter of law, arguing that it never restricted the amount of milk that Woodnotch could produce and/or sell.  Agri-Mark further argues that Woodnotch has failed to allege reasonable reliance; does not sufficiently allege fraudulent intent; had prior knowledge of the proposed changes to Agri-Mark's pricing; fails to sufficiently allege a duty to disclose those proposed

changes; and fails to meet the heightened pleading standard of Rule 9(a).

Under Vermont law, a fraud claim has five elements: "(1) intentional misrepresentation of a material fact; (2) that was known to be false when made; (3) that was not open to the defrauded party's knowledge; (4) that the defrauded party act[ed] in reliance on that fact; and (5) is thereby harmed." *Estate of Alden v. Dee*, 2011 VT 64, ¶ 32, 190 Vt. 401, 35 A.3d 950. "Liability for fraud may be premised on the failure to disclose material facts as well as on affirmative misrepresentations." *Sugarline Assocs. v. Alpen Assocs.*, 155 Vt. 437, 444, 586 A.2d 1115, 1119-20 (1990). Where a party has a duty to disclose a material fact, the failure to do so combined with an intention to mislead or defraud rises to the level of material misrepresentation. *See White v. Pepin*, 151 Vt. 413, 416, 561 A.2d 94, 96 (1989); *see also Standard Packaging Corp. v. Julian Goodrich Architects, Inc.*, 136 Vt. 376, 381, 392 A.2d 402, 404 (1978) (fraud must "consist of some affirmative act, or of concealment of facts by one with knowledge and a duty to disclose"); *accord Sutfin v. Southworth*, 149 Vt. 67, 70, 539 A.2d 986, 988 (1987) ("Vermont has long recognized the doctrine of negative deceit" where there is a duty to speak).

Woodnotch alleges misrepresentations, either affirmative or through concealment, about Agri-Mark's future purchases of milk. The Complaint focuses on Agri-Mark's alleged assurance that there would be no "volume restrictions."  Under the terms of the Member Marketing Agreement, Agri-Mark was required to purchase all milk produced by Woodnotch in exchange for Woodnotch's agreement to sell only to Agri-Mark.  Woodnotch therefore submits that when Agri-Mark communicated no "volume restrictions," it could not have been referring to the amount Agri-Mark would purchase, since Agri-Mark was contractually bound to buy one hundred percent of Woodnotch's produced milk. Nor could it have meant the amount Woodnotch could produce, since Woodnotch was free to produce as much milk as its cows could bear.  Woodnotch thus argues that the phrase "volume restrictions" could only have meant a program or policy that would incentivize members to reduce production.  The Complaint alleges that such a program, the supply management plan, was in fact implemented a month after Woodnotch completed the purchase of Parent Hilltop Farm.

As noted above, when deciding a motion to dismiss for failure to state a claim, a court draws all reasonable inferences in the plaintiff's favor.  *Chase Grp. Alliance LLC v. City of N.Y. Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010). The Court's function is "not to weigh the evidence that might be

presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).  Here, the Court finds it reasonable to infer that Agri-Mark's letters to Woodnotch contained material misrepresentations or omissions.  Woodnotch plausibly claims that although Agri-Mark suggested there would be no upcoming volume restrictions, Agri-Mark knew it would soon be implementing a policy that encouraged reductions in milk output.  When informed of the proposed purchase of Parent Hilltop Farm, Agri-Mark arguably had a duty to disclose its intent to implement such a policy.

Agri-Mark argues that it cannot be held liable for a misrepresentation because its communications referred only to volume, and Woodnotch may still sell its milk to Agri-Mark without any restriction as to amount.  Agri-Mark also notes that the Member Marketing Agreement makes no promises about the price of milk, and expressly allows Agri-Mark to change its price.  Nonetheless, Woodnotch plausibly alleges that Agri-Mark knew it would be altering price in such a way that would disincentivize production above a certain amount, and when asked about future purchases should have informed Woodnotch and its lender of its intentions.

Agri-Mark further argues that Woodnotch knew about the possibility of policy changes, and that its reliance was

unreasonable.  Woodnotch agrees that it knew Agri-Mark could change its policies, which is why it sought assurances before closing on its purchase of a second farm.  For purposes of the pending motion to dismiss, the Court will infer from the facts alleged in the Complaint that Woodnotch did not know about the upcoming supply management program, that it moved forward only after receiving Agri-Mark's assurances about future purchases, and that its reliance on Agri-Mark's statements was reasonable.

Agri-Mark next argues that Woodnotch's allegations of intent to deceive are conclusory.  Woodnotch claims that Agri-Mark was aware of at least the prospect of a policy change, and knew that the change would materially impact the financial viability Woodnotch's expansion, but chose to say nothing in response to inquiries from Woodnotch and its lender.  While intent remains to be proven, the pleadings support a reasonable inference that Agri-Mark knew about the supply management plan when it made its assurances to Woodnotch, and that its failure to disclose the impending policy change was intentional.

Agri-Mark's final contention with respect to Woodnotch's fraud claim is that the allegations fail to meet the requirements of Federal Rule of Civil Procedure 9(b).  Rule 9(b) requires a fraud claim to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b); *see also* Vt. R. Civ. P. 9(b).  The Rule requires a

12

plaintiff to "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 462 (S.D.N.Y. 2009) (quoting *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir. 1999)).

The claims in this case center on two letters sent by Agri-Mark Vice President Scott Werme.  The letters are dated, and Woodnotch has adequately alleged that the content of those letters was fraudulent.  Although Agri-Mark argues that the fraud claim lacks specificity because nothing in the letters mentioned price or pricing policy, Woodnotch alleges that the reference to volume restrictions implicitly suggested a consistent future market, and that Agri-Mark failed to disclose an upcoming material policy change.

Some of Woodnotch's claims are based on "information and belief," which Agri-Mark contends is too speculative to satisfy Rule 9(b).  "Although Rule 9(b) requires that allegations of fraud be plead with specificity, it also provides that '[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally.' In accordance therewith, the Second Circuit has held that 'allegations may be based on information and belief when the facts are peculiarly within the opposing party's knowledge.'"  *Faulkner v. Verizon*

*Communications, Inc.*, 156 F. Supp. 2d 384, 393 (S.D.N.Y. 2001) (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)).  Here, Woodnotch claims upon information and belief that Agri-Mark intended to make fraudulent assurances about future milk purchases.  Such allegations of intent, averred generally and about facts that were exclusively within Agri-Mark's knowledge, satisfy the pleading requirement of Rule 9(b).  Accordingly, the motion to dismiss Woodnotch's allegation of fraud is denied.

## IV.  Promissory Estoppel

Agri-Mark's arguments for dismissal of Woodnotch's remaining claims echo its arguments for dismissal of the fraud claim.  For example, Agri-Mark submits that the promissory estoppel claim, in which Woodnotch alleges a promise to buy milk without volume limitations, is barred as a matter of law because (1) there was no volume restriction and (2) the allegation of reliance is implausible.

"Vermont law follows the Restatement Second formulation of the doctrine [of promissory estoppel], *Foote v. Simmonds Precision Products Co.*, 158 Vt. 566, 573, 613 A.2d 1277 (1992), which provides that '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by

14

enforcement of the promise.' Restatement (Second) of Contracts §
90 (1981)." *Heathcote Assocs. v. Chittenden Tr. Co.*, 958 F.
Supp. 182, 188 (D. Vt. 1997).  The doctrine also requires
"unbargained-for-reliance." *Chomicky v. Buttolph*, 147 Vt. 128,
131 n., 513 A.2d 1174 (1986).  Here, for reasons discussed
above, Woodnotch adequately alleges that the assurances received
from Agri-Mark induced it to complete its purchase of a second
farm, that Agri-Mark should have reasonably expected Woodnotch
to rely on its assurances, and that Woodnotch relied to its
detriment.  The motion to dismiss the promissory estoppel claim
is denied.

## V.    Negligent Misrepresentation

The Vermont Supreme Court has adopted the Restatement
(Second) of Torts definition of negligent misrepresentation:

> One who, in the course of his business, profession or
> employment, or in any other transaction in which he
> has a pecuniary interest, supplies false information
> for the guidance of others in their business
> transactions, is subject to liability for pecuniary
> loss caused to them by their justifiable reliance upon
> the information, if he fails to exercise reasonable
> care or competence in obtaining or communicating the
> information.

Restatement (Second) of Torts § 552(1) (1977); *see Silva v.
Stevens*, 156 Vt. 94, 108, 589 A.2d 852, 860 (1991).  Woodnotch
alleges that Agri-Mark provided false information about future
milk purchases, and "at the very least" failed to exercise
reasonable care in communicating that information.  ECF No. 7 at

6, ¶ 35.  Agri-Mark again argues that there was no such misrepresentation because it never imposed volume limits.  As discussed above, and drawing reasonable inferences in Woodnotch's favor, the Court finds the Complaint states a plausible claim of negligent misrepresentation.

## VI.  Breach of Contract and Implied Covenant of Good Faith

Count IV of the Complaint alleges that the July and August 2019 letters from Agri-Mark constituted enforceable modifications to the Member Marketing Agreement, "obligating [Agri-Mark] to purchase milk from Woodnotch without volume limitations."  *Id.*  The Complaint further alleges that the implementation of an allowed production base violated that modification and constituted breach of contract.  The motion to dismiss argues that while the alleged modification referenced production volume, the policy change in October 2019 pertained only to price.  Agri-Mark also notes that the Member Marketing Agreement allowed it to adjust prices at any time without notice.

As with the other causes of action, the breach of contract analysis centers on whether Agri-Mark made a promise or representation that it would continue to buy all of Woodnotch's milk without restricting volume.  Woodnotch argues that the allowed production base policy constituted a volume restriction, and assuming the Agri-Mark letters modified the Member Marketing

Agreement, the policy violated that Agreement.  For reasons discussed above, Woodnotch has plausibly alleged that a representation or promise was made and subsequently breached, and the motion to dismiss Count IV is denied.

The motion to dismiss Count V, alleging breach of the implied covenant of good faith and fair dealing, is based on essentially those same facts and legal theories and is also denied.  *See Monahan v. GMAC Mortg. Corp.*, 2005 VT 110, ¶ 3, 179 Vt. 167, 170, 893 A.2d 298, 304 (2005) (plaintiff asserting breach of the covenant of good faith and fair dealing must show "an implied-in-law promise not to do anything to undermine or destroy plaintiffs' rights to receive the benefit" of the contract).

## VII. Quantum Meruit

"Under quantum meruit, one should receive the reasonable value of his services where he justifiably relied on the defendant's request for those services regardless of whether the defendant received a benefit."  *In re Estate of Elliott*, 149 Vt. 248, 253, 542 A.2d 282, 286 (1988).  Agri-Mark contends that Woodnotch's quantum meruit claim, like all of Woodnotch's claims, fails because there was no volume limitation.  Woodnotch counters that Agri-Mark's communications amounted to a request for services, that Woodnotch justifiably relied on that request,

and that Woodnotch is entitled to the reasonable value of the goods and services it provided.

Agri-Mark submits that quantum meruit is unavailable in this case because rather than a request for services, the parties' legal relationship was based upon Woodnotch's offer to sell milk.  Although the parties have not fully briefed the issue, the distinction between a request and an offer may not be dispositive since the remedy of quantum meruit has been described simply as "[l]iability in restitution for the market value of goods or services."  Restatement (Third) of Restitution and Unjust Enrichment § 49 (2011); *see United Coastal Indus., Inc. v. Clearheart Const. Co., Inc*., 802 A.2d 901, 906 (Conn. App. 2002) (quantum meruit allows a party to recover "money, services or goods of which he or she was deprived that benefited another").  Woodnotch alleges that it provided goods and did not receive a reasonable value for those goods.  While future briefing and argument may clarify the issue, Court will not dismiss the quantum meruit claim at this early stage in the case.

**VIII. Duplicative Claims**

Agri-Mark also asks the Court to dismiss several claims as duplicative.  Specifically, Agri-Mark argues that certain claims, such as fraud and breach of contract, cannot co-exist since "fraud must be extraneous to a contract, rather than

18

fraudulent nonperformance of the contract itself." *Bevins v. King*, 147 Vt. 203, 204, 514 A.2d 1044, 1045 (1986).  Similar arguments may be made for negligent misrepresentation, promissory estoppel, and breach of the covenant of good faith and fair dealing.  *See, e.g., Howard v. Usiak*, 172 Vt. 227, 232, 775 A.2d 909, 914 (2001) ("negligent misrepresentation does not normally include the intention to perform a contractual commitment") (citation omitted); *Chomicky v. Buttolph*, 147 Vt. 128, 131, 513 A.2d 1174, 1176 (1986) ("the doctrine of promissory estoppel is applicable only where there is no agreement"); *Monahan*, 2005 VT 110, ¶ 54 n.5 ("we will not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when the plaintiff also pleads a breach of contract *based upon the same conduct*").

Woodnotch contends that it is merely pleading in the alternative, and that its claims should not be dismissed until the viability of each of legal theory is established through discovery.  Indeed, Rule 8 of the Federal Rules of Civil Procedure specifically allows alternative pleading, providing that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."  Fed. R. Civ. P. 8(d)(2); *Lawrence v. Wilder Richman Sec. Corp.*, 417 F. App'x 11, 13 (2d Cir. 2010) (summary order) (Rule 8(d)(2) "specifically permits a

party to plead inconsistent positions in the alternative, even in the same action"); *see also Padre Shipping, Inc. v. Yong He Shipping*, 553 F. Supp. 2d 328, 333 (S.D.N.Y. 2008) ("plaintiffs are allowed to assert inconsistent facts in support of alternative claims, and courts may not construe allegations regarding one claim to be an admission against another"). Woodnotch may therefore allege alternative, though perhaps ultimately inconsistent, claims in its Complaint.

## IX.  Attorney's Fees

Count VII of the Complaint seeks attorney's fees under the terms of the Member Marketing Agreement and Vermont common law. Agri-Mark argues that there is no basis for an award of attorney's fees, citing the "American Rule" whereby parties must bear their own litigations costs.  In its opposition memorandum, Woodnotch submits that "even absent a contractual or statutory provision for attorney's fees," Vermont has allowed an award of fees based upon a showing of bad faith.  ECF No. 15 at 22-23.

In *Southwick v. City of Rutland*, the Vermont Supreme Court stated that "[w]hen addressing a question of attorney's fees, Vermont adheres to what is called the American Rule: parties must bear their own [attorney's] fees absent a statutory or contractual exception."  2011 VT 105, ¶ 5, 190 Vt. 324, 30 A.3d 1298 (quotation omitted).  Nonetheless, the Vermont Supreme Court has acknowledged "the historic powers of equity courts to

20

award attorney's fees as the needs of justice dictate."  *In re Gadhue*, 149 Vt. 322, 327, 544 A.2d 1151, 1154 (1987).  Although the Vermont "standard for departing from [the American Rule] is demanding," *Knappmiller v. Bove*, 2012 VT 38, ¶ 4, 191 Vt. 629, 48 A.3d 607 (mem.), "equity may allow for exception to the American Rule when the other party has acted in bad faith." *Depot Square Pizzeria, LLC v. Dep't of Taxes*, 2017 VT 29, ¶ 16, 204 Vt. 536, 544, 169 A.3d 204, 210 (2017); *see also Town of Milton Bd. of Health v. Brisson*, 2016 VT 56, ¶ 29, 202 Vt. 121, 132, 147 A.3d 990, 998 (2016) (noting the expansion of Vermont's exception to the American Rule where "bad faith action of one person caused another person to incur litigation expenses in unnecessary judicial proceedings with the wrongful actor").

Woodnotch alleges that Agri-Mark acted in bad faith, and discovery is required to determine whether Woodnotch can meet the "demanding" standard for attorney's fees.  Because the attorney's fees claim is not implausible, it will not be dismissed at this time.  The motion to dismiss Count VII is denied.

## Conclusion

For the reasons set forth above, Agri-Mark's motion to dismiss the Complaint (ECF No. 12) is denied.

DATED at Burlington, in the District of Vermont, this 13th day of April, 2021.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge